**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| David W. Carter, et al., | ) | **CASE NO. 1:14 CV 1854** |
| | ) | |
| Plaintiffs, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| Monte Hamaoui, et al. | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendants Monte Hamaoui and the City of Rocky

River's Motion for Summary Judgment (Doc. 69); Defendant Ohio State Highway Patrol

Trooper James Baker's Motion for Summary Judgment (Doc. 71); and Defendant Monte Hamoui

and the City of Rocky River's Motion to Strike Affidavit of Joseph Wilkes (Doc. 91). This is a

civil rights dispute.  For the following reasons, all of defendants' motions are GRANTED.

**FACTS**

Plaintiffs, David Carter, Robert Thomson, and Our All American Recycling Company

("All American"), bring this action against defendants, the City of Rocky River, Officer Monte

Hamaoui of the Rocky River Police Department, and State Trooper James Baker of the Ohio

1

State Highway Patrol. Carter and Thomson allege that Officer Hamaoui and Trooper Baker violated Carter's and Thomson's civil rights in connection with a traffic stop and search of the vehicle that they were driving on August 22, 2013. All American brings a conversion claim against Rocky River. Carter and Thomson also brought several state law claims against Officer Hamaoui and a failure to properly train claim against Rocky River, but they have withdrawn these claims.

Our All American Recycling, Ltd. buys metals from the public that it sorts, processes, and upgrades at a facility in Lorain, Ohio, and resells to a Cleveland company called Ferrous Processing Company. All American accumulates large quantities of aluminum cans, hydraulically crushes them into 48-inch square bales, and sells them to Ferrous Processing. Carter manages the day-to-day operations of All American and transports metals to Ferrous Processing once or twice a week. Thomson is a retired commercial truck driver who is not employed by All American but occasionally helps out.

Carter was scheduled to deliver a load of recycled materials to Ferrous Processing on August 22, 2013. He picked up Thomson in a black flatbed truck and set out for Ferrous Processing around 12:30 p.m., heading eastbound on Interstate 90 from Lorain County. The truck was loaded with copper, brass, and aluminum extrudings, and three bales of crushed aluminum cans that had been shrinkwrapped. Carter set his cruise control for 55 miles per hour (Carter Dep. 13, 15; Thomson Dep. 14) and drove through Rocky River in the outside lane next to the berm of the road, not weaving in any way. (Carter Aff. ¶ 9; Thomson Aff. ¶ 10).

2

1.      <u>The traffic stop</u>

That same day, a confidential informant contacted a Lorain police detective, Tim Thompson, and claimed that a black flatbed truck carrying metal scrap possibly had marijuana stored in bales of aluminum cans. (Goodwin Dep. 6, 12-13, 39-40). Detective Thompson called Special Agent James Goodwin of the United States Drug Enforcement Agency to tell him that a "reliable confidential informant" had relayed the tip. (Goodwin Dep. 6, 12). Goodwin did not ask Thompson about the identity or reliability of the confidential informant. (Goodwin Dep. 13-14, 17). After receiving the tip, Goodwin spoke with State Trooper Terry Helton about it. (Goodwin Dep. 8, 14; Helton Dep. 7, 11). Goodwin asked Helton to "see if anybody was available to ... look out for the vehicle." (Helton Dep. 12-13).

Helton called two field officers, Defendant James Baker and Timothy Timberlake, and relayed the tip from Goodwin. He told them to stop the truck if they could "establish probable cause [for]... a traffic stop." (Helton Dep. 42, 44). Goodwin also called Lieutenant William Crates of the Rocky River Police Department. (Goodwin Dep. 15, 18-19; Crates Dep. 13). Goodwin spoke with Crates about 1:00 p.m. and relayed that a "flatbed truck [was] ... eastbound on 90 from Lorain County...that...[may] have narcotics within the aluminum cans that were part of a load." (Crates Dep. 12, 17).

Crates then contacted Defendant Hamaoui by chat message, asking Hamaoui to call him. Before Hamaoui responded, Crates sent a second chat message at 1:04:31 p.m. stating: "I-90 E/B from Lorain DEA CI [confidential informant] reports flatbed black in color may have bags of MJ [marijuana] between bags of pop." (Crates Dep., Ex. 1). Crates and Hamaoui then spoke by cell phone, and Crates relayed the same information. Two minutes later, Crates sent Hamaoui

3

another chat message to "remember it is a CI so make your own PC [probable cause]." (Crates Dep., Ex. 1).

After receiving the message, Hamaoui positioned himself on the berm of an off-ramp of Interstate 90 (perpendicular to the highway) to watch for a vehicle matching the description of the truck. (Hamaoui Dep. 21, 24). He saw the truck after about fifteen to twenty minutes. (Hamaoui Dep. 25, 31). Hamaoui testified that based on his training and experience, he determined that the truck was moving between 45-50 miles per hour, which was slower than the posted speed limit of 60 miles per hour. (Hamaoui Dep. 34-36, 39). Hamaoui also states that he observed the truck weaving in its lane as it approached him (Hamaoui Dep. 45, 54) and that the tires were bulging (Hamaoui Dep. 60).

Hamaoui pulled out from where he was parked to follow the truck; he states that the truck was still weaving when he got behind it. (Hamaoui Dep. 39, 46). Hamaoui did not pull the truck over immediately because the area between Hilliard Road and Detroit Road is a "dead-zone," an area where backup would not be readily available. (Hamaoui Dep. 43). Hamaoui's dashcam video shows him following the truck for about a mile, and the video does not show Carter's truck weaving either within or over the line. (Hamaoui Dep. 43-44). Hamaoui states that this is because the video did not come on until he activated his overhead lights, and the weaving occurred before the video was on. (Hamaoui Dep. 41, 51). The dashcam video also shows the speed of Hamaoui's vehicle was between 50 and 53 miles per hour as it followed Carter's truck.

Officer Hamaoui pulled the car over and approached the truck on the passenger side. As he did so, he states that he smelled the odor of marijuana. Carter and Thomson testified that Hamaoui told them he was working on a "drug detail" and that a drug dog had detected narcotics

as their truck drove by. (Carter Dep. 19-20; Thomson Dep. 41, 43-44). Hamaoui does not recall

saying that he was working a drug detail, and he denies saying anything about the dog detecting

narcotics from the side of the road. (Hamaoui Dep. 105, 221-222). Hamaoui's dashcam video

shows Hamaoui identifying himself and asking the plaintiffs where they are heading, what they

do for a living, for their insurance information, if there are any weapons in the vehicle, who

owned the vehicle, and if anything illegal is in the vehicle. (Hamaoui Video at 13:22:45-

13:24:50). While the plaintiffs' responses to these questions are mostly inaudible, Hamaoui's

voice can be heard. The video does not show Hamaoui saying anything about participating in a

drug detail or about a drug dog detecting narcotics as the truck drove by. Hamaoui told Carter

and Thomson to put their hands on the dashboard of the truck and to produce their identification,

which they did.

Meanwhile, several minutes after receiving the tip from Helton, Trooper Baker saw

Carter's truck traveling eastbound on Interstate 90 as Baker was driving westbound. (Baker Dep.

17, 20). Baker took an exit to re-enter the highway in the eastbound lanes, and by the time he

caught up to the flatbed truck, Hamaoui had already stopped the vehicle. (Baker Dep. 17-18).

Baker activated his police lights and pulled his vehicle behind Hamaoui's cruiser moments after

Hamaoui pulled Carter over. (Baker Dep. 17).

Baker approached Hamaoui  to speak about the vehicle. (Baker Dep. 30-32). The two had

never met and state that they did not have any type of communication with one another before

Baker approached Hamaoui at the traffic stop. (Baker Dep. 27; Hamaoui Dep. at 73, 78, 90).

Hamaoui did not discuss with Baker his basis for stopping the flatbed tow truck, but the officer

mentioned that he received a tip from his Rocky River lieutenant to look out for a "flatbed truck

with aluminum cans" on the back because the truck was suspected of trafficking narcotics inside the crushed aluminum. (Hamaoui Dep. 78-79). Baker shared that he received the same tip from a State Highway Patrol supervisor. (Hamaoui Dep. 79; Baker Dep. 122).

2.      The dog sniff and initial search

As the first responding officer, Hamaoui was in charge of the scene, so he asked Baker to conduct a canine sniff of the flatbed truck with Baker's canine partner Paco, an all-black German shepherd. (Baker Dep. 28, 76, 156; Hamaoui Dep. 86, 110-11). Hamaoui asked Carter and Thomson to exit the vehicle so that the dog would not be distracted during the sniff. As part of his normal procedure, Hamaoui conducted a pat-down of Carter. (Hamaoui Dep. 91). He noticed two large bundles in Carter's front pockets and found more than $10,000 in Carter's pockets but no marijuana. (Hamaoui Dep. 91, 93; 169; Carter Dep. 29). Carter told Hamaoui that he had the money to purchase small motors. Hamaoui put the money in his own pocket and eventually returned it to Carter. (Hamaoui Dep. 95, 170). Hamaoui then placed Carter and Thomson in the back of separate locked patrol cars for their own safety because they were on the side of the highway; he did not handcuff the men. (Hamaoui Dep. 87-89).

While Carter and Thomson were in the cruisers, Baker began walking Paco around the flatbed truck, beginning at the driver-side rear of the vehicle. (Baker Dep. 49). Consistent with Paco's training, Baker walked Paco around the truck two times in a counter-clockwise direction, presenting different areas of the truck for Paco to sniff. (Baker Dep. 49, 55-56; Baker Video at 13:28:22-13:29:05). On Paco's second walk around the vehicle,[1] he stopped at the passenger-

---

[1]      During Baker's deposition, he mistakenly testified that the alert occurred on the first walk-around. The video is clear, however, that the alert happened the second time that Paco walked around the truck.

side rear and indicated to the odor of narcotics near one of the bales of aluminum metal by jumping up onto the vehicle with his front paws and "scratching" the area of the vehicle where he smelled narcotic odor. (Baker Dep. at 50; Baker Video at 13:28:56-13:29:05).

Baker is an experienced canine handler, and Paco has been certified through the Ohio Peace Officer Training Academy as a police canine. (Baker Dep. 105-06). At the time of the stop, Baker had worked with Paco for two years. (Baker Dep. 14). Baker trains with Paco sixteen hours a month[2] and has him re-certified once a year. (Baker Dep. 109). Paco is trained to indicate when he smells the odor of narcotics by jumping up and making a scratching motion with his front paws, indicating to the area where he smells the odor. (Baker Dep. 13, 153). To make sure that Paco had intended to indicate to the odor of narcotics, Baker conducted a "proof out." To do so, Baker tried to get Paco to sniff a different area of the truck by guiding and commanding him "look here" to sniff another area of the vehicle. (Baker Dep. 148-49; Baker Video at 13:28:58-13:29:01). Baker knew that Paco was positively indicating to the odor of narcotics when he refused to stop scratching. (Baker Dep. 148-49; Baker Video at 13:28:58-13:29:01). Once Paco indicated to narcotic odor, Baker removed Paco's "reward toy," a white PVC plastic pipe,[3] from his back pocket and threw the toy up against the side of the truck out of his right hand. (Baker Dep. 53, 101-02; Baker Video at 13:29:04-13:29:06).

In his deposition, Carter did not dispute that the canine alerted, but plaintiffs now claim that the alert occurred because Baker put the toy on the bed of the truck prior to the alert. (Carter

---

[2]    Not all of the training is focused on narcotics detection. (Baker Dep. at 113).

[3]    A law enforcement canine's "reward toy" is "a toy that is given to the dog when he indicates to the odor of narcotics. ...The dog thinks 'I'm looking for my toy,' which is associated with the odor of narcotics." (Baker Dep. 52).

Dep. 32, Carter Aff. ¶ 16; Thomson Aff. ¶ 15). Plaintiffs base this assertion solely on Baker's

dashcam video, which they claim shows Baker putting the toy on the bed of the truck prior to the

alert.[4] Neither plaintiff testified that they witnessed Baker doing this at the time of the dog sniff.

Baker denies that he took the toy out of his pocket before Paco alerted (Baker Dep. 52). The

video does not show Baker putting a toy on the back of the truck in the area where Paco was

scratching. (Baker Video at 13:28:56-13:29:03).

At some point during the traffic stop, other law enforcement officers arrived at the scene,

including Ohio State Highway Patrol Trooper David Norman. (Baker Dep. 41; Norman Dep. 14-

15, 16-17). Norman also walked his canine partner, Storm, around the truck, but Storm did not

alert. (Norman Dep. 20; Baker Dep. 59). Helton testified he had previously worked with Paco

and had seen the dog alert to the presence of narcotics when none were found, but he noted that

"[t]here's no dog out there that's perfect." (Helton Dep. 28-29). Baker conceded "there could be

some wonder" about why Norman's dog did not alert but Paco did. (Baker Dep. 60).

After Paco alerted, Baker read Carter his *Miranda* rights and asked whether he had

anything illegal in his vehicle. (Baker Dep. 62-64;  Carter Dep. 74). Carter denied having any

narcotics on his truck. (Carter Dep. 75). Hamaoui and Baker then did an initial search of

Plaintiffs' vehicle.[5] They looked inside the cab of the truck, on top of the flatbed, and around the

different pieces of scrap metal. (Hamaoui Dep. 112-13; Baker Dep. 69-70). The officers found

---

[4]     Paco's alert and Baker's throwing the reward toy can be seen and heard on Baker's dashcam but cannot be seen on Hamaoui's dashcam because of the position of the camera.

[5]     Another Rocky River Detective, Tracey Hill, also searched the contents of the truck on the roadway.

8

no evidence of drugs on the bed or in the cargo of the truck.

       3.    <u>The subsequent search</u>

The officers determined that they could not safely search the truck thoroughly on the side of the road, so they decided to move it to the Rocky River service garage. (Crates Dep. 70-71). Crates contacted Officer Jeffrey Hine by radio and told Hine to meet him at the Rocky River service garage because he wanted him to weigh a suspected overweight vehicle. (Hine Dep. 8-10). Hine is a patrolman with the Rocky River Police Department and has been trained on how to weigh a commercial vehicle. (Hine Dep. 7, 27). The empty weight of the truck was 13,500 pounds, and its maximum allowable gross weight was 19,500 pounds. (Hamaoui Dep, Ex. 1; Hine Dep. 29, 40-41). After weighing the truck, Hine determined that the total weight of the vehicle was 26,100 pounds, which was 6,600 pounds overweight. (Hine Dep. 31-32). As he weighed the vehicle, he observed that there was a load-induced tire bulge on the rear axle of the truck. (Hine Dep. 34-35).

The officers then searched the truck including all material, boxes, and drums on the truck bed as well as well as the truck's compartments, cabin, and underneath. The officers broke the bales of aluminum cans apart so they could sift through them on the ground. Both Paco and Storm participated in the search. Neither dog alerted, and no narcotics were recovered.

Hine issued Carter an overweight vehicle citation under Rocky River Ordinance 339.01. Hamaoui told Carter that he could come back to retrieve the cans that had been spread over the ground. Carter never came back to retrieve the cans. (Carter Dep. 52). The citation was later dismissed without prejudice.

Plaintiffs now bring suit against Hamaoui, Baker, and the City of Rocky River. In their

first count, they allege that Hamaoui violated their constitutional right to be free from unreasonable searches and seizures. In their seventh count, they claim that Baker conspired with Hamaoui to violate their right against unreasonable searches and seizures. In the sixth count, All American brings a conversion claim against the City of Rocky River. Plaintiffs have withdrawn all other counts in the Complaint. Defendants now move for summary judgment, arguing that they are immune from suit. Plaintiffs oppose the motion. Defendants Hamaoui and the City of Rocky River also move to strike the affidavit of Joseph Wilkes, which plaintiffs submitted in support of their brief in opposition. Plaintiffs oppose this motion as well.

### **MOTION TO STRIKE**

Joseph Wilkes is a paralegal for plaintiffs' attorney. In his affidavit, which plaintiffs submit in support of their brief in opposition to defendants' motions for summary, Wilkes avers that he reviewed the dashcam videos from Officer Hamaoui's and Trooper Baker's cruisers. Based on his review, he asserts that he was able to conclude that Baker "could not possibly have seen [plaintiffs'] truck as it drove eastbound on I-90 until he caught up to Hamaoui pulling the truck over." (Wilkes Aff. ¶ 7). Plaintiffs offer Wilkes as a fact witness.

Wilkes's affidavit is stricken. Plaintiffs did not comply with Rule 26 of the Federal Rules of Civil Procedure because they never identified Wilkes as a witness during discovery. They did not identify Wilkes in their initial disclosures as a person having knowledge about the complaint, nor did they supplement their disclosures by later identifying him as a potential witness. Their responses to defendants' written discovery requests also did not identify Wilkes as a person with discoverable information or as a potential witness in the case. According to Rule 37(c), Plaintiffs therefore cannot use Wilkes's affidavit in support of their brief in opposition. Additionally, a fact

witness may only testify to a matter if the witness's testimony is based on personal knowledge. Fed. R. Evid. 602. Wilkes's own affidavit makes clear that he has no personal knowledge regarding the events on August 22, 2013. His only knowledge about this case is from his review of the dashcam videos.

If Wilkes's affidavit is stricken, plaintiffs ask that the Court take "judicial notice of the facts set forth in [his] affidavit." Under Fed. R. Evid. 201(b), "a court may take judicial notice of a fact not subject to reasonable dispute because it is (1) generally known within the trial court's jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c). As an initial matter, Wilkes's statement that Baker could not have seen plaintiffs' truck as it drove eastbound on I-90 is a conclusion rather than a fact, and as such, is not subject to Rule 201. Additionally, plaintiffs have not identified any specific facts that they want the Court to take judicial notice of. Even if they had, none of the other statements in Wilkes's affidavit are appropriate for judicial notice. For example, Wilkes avers that:

> I used the measuring tool from Google maps to determine the distance between where the Hamaoui dash-cam video on I-90 begins to the point where officer Hamaoui moved directly behind the truck and activated his overhead lights to initiate a traffic stop. This is readily apparent from the reflection of the cruiser's lights in the video which begins at 13:21:51. This distance is about 3,187 feet.

(Wilkes Aff. ¶5(D)).[6] Plaintiffs have not identified the particular "tool" that Wilkes used or the accuracy of the tool; thus, they have not shown that the facts in Wilkes's affidavit meet the

---

[6]    Wilkes makes similar averments about other locations and distances in the dashcam videos.

11

requirements in either Rule 201(b) or (c).

Finally, plaintiffs' request for leave to "file a supplemental affidavit from an investigator who will measure the distances and photographs the landmarks so that this Court can understand the video evidence presented" is untimely.

Defendants Monte Hamoui and the City of Rocky River's Motion to Strike Affidavit of Joseph Wilkes (Doc. 91) is therefore granted.

## **MOTIONS FOR SUMMARY JUDGMENT**

### **Summary Judgment Standard**

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56,

12

Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence

13

on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Analysis

To establish a claim under 42 U.S.C. § 1983, a plaintiff must show that a person acting under color of state law deprived him of a right secured by the Constitution or by federal law. *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007). Qualified immunity, however, can shield a police officer from suit when he "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Id.* (quotations omitted).

Qualified immunity is generally a two-step inquiry. The court first determines whether a constitutional violation has occurred. *Neal v. Melton*, 453 Fed. Appx. 572, 575 (6th Cir. 2011). If the defendant did not violate the plaintiff's constitutional rights, the § 1983 claim fails as a matter of law. *Id.* If a constitutional violation occurred, the court then asks whether that right was clearly established in light of the specific circumstances of the case. *Id.* Qualified immunity is appropriate "if the law is not sufficiently clear such that a reasonable officer would be on notice that his conduct is clearly unlawful." *Id.* at 576. If a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that it does not apply. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

14

A.     Plaintiffs'[7] Fourth Amendment claims

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Plaintiffs claim that defendants violated their Fourth Amendment rights when: (1) defendants pulled plaintiffs over at the initial traffic stop without probable cause or reasonable suspicion to believe that plaintiffs had committed a crime; (2) searched plaintiffs' truck on the side of Interstate 90; and (3) searched plaintiffs' truck at the Rocky River service garage. The Court will discuss each event in turn.

1.     The traffic stop

The Fourth Amendment's protections extend to brief investigatory stops that fall short of traditional arrest. *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). In such situations, an officer does not violate the Fourth Amendment if the stop is supported by his or her reasonable suspicion that "criminal activity may be afoot." *Id.* (internal quotations omitted); *Reid Machinery Inc. v. Lanzer*, 421 Fed. Appx. 497, 502 (6th Cir. 2010). If, in considering the totality of the circumstances, the officer had a "particularized and objective basis" for suspecting wrongdoing, then the officer had reasonable suspicion to make the stop. *Arvizu*, 534 U.S. at 273. The concept of "reasonable suspicion" is "somewhat abstract." *Id.* at 274. It requires more than a mere "hunch," but the likelihood of criminal activity "need not rise to the level necessary for probable cause and falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Sokolow*, 109 S. Ct. 1581(1989)). A

---

[7]     In sections A and B, the term "plaintiffs" is used in reference to Carter and Thomson, and the term "defendants" is used in reference to Hamaoui and Baker.

police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct. *U.S. v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002); *Whren v. United States*, 517 U.S. 806, 813 (1996). But, the court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely. *Id.*

Here, defendants state that plaintiffs were stopped for several reasons. The Court finds that the initial traffic stop did not violate plaintiffs' Fourth Amendment rights because Hamaoui had reasonable suspicion that the truck was overweight due to his observation of the truck's bulging tires, slow speed, and large load. It therefore need not address the other reasons that defendants raise for the stop.

Plaintiffs argue that Hamaoui did not have reasonable suspicion that their vehicle was overweight because "bulging tires, without more evidence, are insufficient as a matter of law to justify ... a traffic stop." (Pls.' Br. in Opp. at 25) (citing *Toledo v. Harris*, 99 Ohio App. 3d 469 (Ohio 6th Dist. 1994) ("the mere presence of bulging tires on a vehicle is insufficient to create a reasonable suspicion that such a vehicle is overweight"). In support, they note that Hamaoui had no training in how to detect overweight vehicles, did not know how much the truck could lawfully weigh, could not identify the extent to which the tires were bulging, and did not know that the truck was equipped with radial tires, which "always have a slight natural deflection whether or not there is weight on them." (Id.).

Based on the undisputed evidence in the record, the Court finds that the totality of the circumstances gave Hamaoui reason to suspect that the plaintiffs' truck was carrying an

overweight load in violation of Ohio law.[8] At the time of the stop, Hamaoui was aware that the truck was traveling below the speed limit; that the truck was carrying a visibly large load of materials; and that the vehicle's tires were bulging.[9] *See City of Toledo v. Harris*, 99 Ohio App. 3d 469 (6th Dist. 1994) (finding that officer had reasonable suspicion that defendant's vehicle was overweight because it had bulging tires and difficulty starting from a stopped position).

Plaintiffs admit that they had set the cruise control on the truck to 55 miles per hour and that Hamaoui's dashcam video shows the truck traveling between 50 and 53 miles per hour. Plaintiffs also cannot dispute that Hamaoui's dashcam video shows that the truck was heavily loaded with materials. *See Oliver v. Greene*, 613 Fed. Appx. 455, 457 (6th Cir. 2015) (noting that a court is "free to trust their eyes when a videotape unequivocally shows what happened during an encounter with the police"). Finally, plaintiffs admit that the truck's tires appeared to be bulging. (*See* Carter Dep. 26; Thomson Dep. 17). Though they claim that this is because they were radial tires, which normally appear to bulge, Hamaoui would have had no reason to know what type of tires the truck was equipped with as he watched it driving past on I-90. Nor does it change the fact that the tires appeared to be bulging.

---

[8]     *See* Ohio Rev. Code§ 4513.33 ("Any police officer having reason to believe that the weight of a vehicle and its load is unlawful may require the driver of said vehicle to stop and submit to a weighing of it."); Rocky River Ordinance 339.01 ("No person shall operate or move a vehicle ...of a size or weight of vehicle or load exceeding the maximum specified in [the] Ohio [Revised Code] ...upon any State route within the Municipality.")

[9]     Defendants also argue that Hamaoui suspected that the truck was overweight because it was weaving. But plaintiffs dispute that they ever weaved either within or over their lane while they were driving through Rocky River, and Hamaoui's dashcam video does not show plaintiffs' truck weaving. The Court has therefore not considered this evidence in determining whether Hamaoui had a reasonable suspicion that the truck had an overweight load.

17

Plaintiffs argue that Hamaoui could not have reasonably suspected that the truck was overweight because he had no training in how to detect overweight vehicles and he did not know how much the truck could lawfully weigh. (Pls. Br. at 25). Plaintiffs' argument takes Hamaoui's testimony out of context. Hamaoui merely testified that he had never been formally trained in overweight enforcement or how to use portable scales to weigh trucks. (Hamaoui Dep. at 58). He did not testify that this meant he was incapable of suspecting, based on a visual inspection, that a truck was overweight. Nor does the fact that Hamaoui did not know how much the truck could lawfully weigh raise a genuine dispute of material fact. Given that there are hundreds of different types of vehicles traveling on the roadways, it would be unreasonable to require an officer to know how much a vehicle is lawfully required to weigh before he could pull it over for suspicion of being overweight. Here, given the large load that plaintiffs were carrying, the truck's slow speed, and the bulging tires, Hamaoui had reasonable suspicion to believe that it was overweight. This suspicion was confirmed when the weighing revealed that the truck was overweight by more than 6,000 pounds.

For these reasons, the traffic stop did not violate plaintiffs' constitutional rights.

2.    The initial search on I-90

The duration of a traffic stop must be tailored to its underlying justification. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). The stop can last "no longer than is necessary to effectuate [its] purpose." *Id.* The Supreme Court has held that the Fourth Amendment allows some unrelated investigations that do not lengthen a roadside detention. *Id.* Because a dog sniff is not technically a "search" under the Fourth Amendment, an officer can conduct a sniff during a lawful traffic stop so long as the sniff does not unreasonably prolong the initial stop. *Illinois v.*

18

*Cabbelles*, 543 U.S. 405, 409 (2005).

Here, plaintiffs agree that Paco's sniff during the initial traffic stop did not unreasonably prolong the initial traffic stop. (Pls.' Br. in Opp. at 2406) ("Plaintiffs agree there was only a short time (less than ten minutes) between when the traffic stop was effected and when Paco first walked around the truck."). Moreover, the purpose of the initial stop could not be effectuated until the truck was taken to the Rocky River service garage for weighing. Baker arrived only moments after Hamaoui stopped plaintiffs and conducted the dog sniff shortly thereafter, well before the weighing could be completed. Thus, the dog sniff did not prolong the stop at all.

Plaintiffs also agree "that an alert by a properly trained and reliable narcotics canine provides probable cause for the search of a vehicle." (*Id.*) (citing *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013).[10] Plaintiffs' dispute with the search of their vehicle is that they believe Paco's alert was unreliable. First, they maintain that Baker put Paco's reward toy on the truck, which caused Paco to alert. Baker's dashcam video, however, shows that this is not the case. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380

---

[10]     Defendants also did not violate plaintiffs' rights by placing them in a police cruiser while the sniff was conducted. Detention in a police cruiser does not automatically transform an investigative stop into an arrest. *United States v. Calderon-Valenzuela*, 2000 WL 571953, at *4 (6th Cir. 2000) (citing *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996)). A suspect may be detained in a police cruiser until the purposes of an initial traffic stop are completed. *Id.* Here, plaintiffs were placed in the cruisers for their own safety as the cars were parked alongside a highway and so that they did not create a distraction for Paco during the sniff.

(2007). Because plaintiffs' version of the facts is "blatantly contradicted" by the video evidence, the Court need not adopt their version. *Id.*

Second, plaintiffs argue that the alert was unreliable because: Paco did not alert on one of his walk-arounds; another police dog, Storm, did not alert; neither dog alerted once the bales of aluminum cans were taken off the truck and spread out; and there is evidence that Paco has given false alerts in the past. None of these arguments is persuasive. In *Florida v. Harris*, the Supreme Court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." 133 S.Ct. 1050, 1057 (2013).

Paco is a certified police canine, trains with Baker each month, and is re-certified once a year. Plaintiffs do not contest the adequacy of Paco's training or certification program, and the evidence that they present to show that his alert was unreliable is insufficient to rebut the presumption of reliability based on his certification. Specifically, while Paco did not alert on one of the walk-arounds, this is explained by the fact that Baker presented different areas of the vehicle to sniff on each walk-around. Although the search yielded no narcotics and neither dog alerted when the contents of the truck were spread out, the Court in *Florida v. Harris* cautioned against "the hazards of inferring too much from the failure of a dog's alert to lead to drugs." *Id.* at 1059. Moreover, as the Court noted, probable cause is not evaluated in hindsight, "based on what a search does or does not turn up." *Id.* While plaintiffs point to Trooper Helton's testimony that Paco has given false alerts in the past, they have not presented any evidence of how many

times he has falsely alerted or under what circumstances. Helton also testified that "no dog is perfect." Thus, this is insufficient to rebut the presumption of reliability based on Paco's certification and continued training.

Because Paco's alert gave defendants probable cause to search plaintiffs' vehicle, the initial search on the side of I-90 was constitutional.

>    3.    The subsequent search at the Rocky River service garage

Lastly, Plaintiffs contend that the subsequent search at the Rocky River service garage was unconstitutional because the automobile exception did not apply to that search. They contend that probable cause disappeared once the initial search on I-90 revealed no narcotics.

The officers searched the truck to the extent that they were able while it was on the side of the highway, but they decided that they could not safely and thoroughly search the vehicle unless it was moved to a safer location. (Crates Dep. at 70-71). Based on the undisputed evidence in the record, a reasonable jury could only conclude that this was true–the officers could not complete the search safely while the truck was still on the roadside. From the tip, the officers were aware that the alleged narcotics were hidden in the bales of aluminum cans stacked on the truck. According to Carter, the bales were 48 inches by 48 inches, shrink-wrapped, and banded with metal bands. (Carter Dep. at 10). There was no way for the officers to take the bales apart while the truck was still parked on I-90. Paco's alert, which corroborated the tip that the truck contained narcotics, gave the officers probable case to take the truck to the service garage, where they could unwrap the bales and search through the aluminum cans. Indeed, the dashcam video shows that, once the truck was moved to the service garage, defendants had to use heavy machinery to move its contents, demonstrating that they could not have conducted this search on

the side of the highway.

Thus, the search at the Rocky River service garage was constitutional.

4.      The alleged conspiracy between Hamaoui and Baker

Plaintiffs allege that Hamaoui and Baker conspired to violate their Fourth Amendment rights. Based on the evidence in the record, no reasonable jury could conclude that such a conspiracy existed. Both officers testified that they did not know each other prior to August 22, 2013, and that they had no prior communication before the traffic stop. Plaintiffs have produced no evidence to dispute these facts. It is also undisputed that both officers independently received the tip that plaintiffs' truck was possibly engaged in drug trafficking. Plaintiffs' only evidence in support of the conspiracy claim is based on Wilkes's affidavit that it would have been impossible for Baker to have seen their truck proceeding eastbound on I-90, so "the only reasonable conclusion to be drawn is that Baker and Hamaoui were in contact with each other, either directly or indirectly, and acted as a team." (Doc. 88, Pls.' Br. in Opp., at 2430). But the Court has stricken Wilkes's affidavit and therefore will not consider it in ruling on the motions for summary judgment. Because plaintiffs have offered no evidence to support their conspiracy claim against Baker, Baker is entitled to summary judgment on this claim.

B.      Qualified Immunity

Plaintiffs cannot establish a constitutional violation, so Hamaoui and Baker need not seek qualified immunity. Nevertheless, the Court finds that, even if they did violate plaintiffs' Fourth Amendment rights, qualified immunity shields them from liability.

As noted above, once a constitutional deprivation has been established, the next step of the qualified immunity analysis is to determine if the right at issue was clearly established. Here,

the court considers whether the officer's action was objectively reasonable, "in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). The purpose of qualified immunity is "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (internal quotation marks omitted)). "The right in question...cannot be simply a generalized right, like the right to due process. It must be clearly established in a 'particularized' sense, so that the 'contours of the right are clear enough for any reasonable official in the defendants' position to know that what the official is doing violates that right." *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir. 1989) (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)).

Plaintiffs bear the burden of showing that defendants are not entitled to qualified immunity. To do so, they argue that it was clearly established on August 22, 2013, that an officer must have reasonable suspicion to stop a vehicle and probable cause to search a vehicle without a warrant. They also reiterate several of the arguments they made to show that the stop and searches were unconstitutional.

Plaintiffs have failed to show that qualified immunity should not shield defendants' actions. First, even if Hamaoui did not have sufficient reasonable suspicion to stop the truck for being overweight, plaintiffs have not shown that any official in his position would have known that the stop violated plaintiffs' rights. While plaintiffs note that Hamaoui did not have specific training in overweight enforcement, they cite no case law holding that an officer *must* have such training before he or she can stop a vehicle on suspicion of being overweight. Nor does the Ohio statute or Rocky River ordinance governing overweight vehicles state that an officer must have training in overweight enforcement before he or she can stop a vehicle for being overweight.

23

*See, e.g.,* Ohio Rev. Code§ 4513.33 ("*Any police officer* having reason to believe that the weight of a vehicle and its load is unlawful may require the driver of said vehicle to stop and submit to a weighing of it.") (emphasis added). Given the particular facts of this case–the truck's visibly large load, slow speed, and bulging tires–the Court holds that Hamaoui's decision to pull the truck over was objectively reasonable.

Second, the Court finds that a reasonable officer in defendants' position would have believed that he or she had probable cause to conduct the search on the side of I-90. The law was clearly established on August 22, 2013, that "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume ... that the dog's alert provides probable cause to search." *Florida v. Harris*, 133 S.Ct. 1050, 1057 (Feb. 19, 2013). As noted above, the plaintiffs did not produce sufficient evidence to overcome the presumption of probable cause. While it is true that Storm did not alert during his walk-around of plaintiffs' truck, plaintiffs have produced no case law showing that an alert by one dog is rendered unreliable if a second dog does not alert. Moreover, Paco's alert corroborated the confidential informant's tip, giving the officers sufficient probable cause to search the truck.

Finally, plaintiffs have offered no case law showing that it was clearly established on August 22, 2013, that defendants "lost" their probable cause once the initial search on the side of I-90 did not yield any narcotics. Given the particular facts of this case, a reasonable officer in defendants' position would have concluded that the truck could not be safely and thoroughly searched while it was parked on the side of the highway. (*See* Section A.4. above).

Because Officer Hamaoui and Trooper Baker did not violate plaintiffs' constitutional rights and are entitled to qualified immunity even if they did, their motions for summary

judgment are granted.

C.      All American's conversion claim

According to All American, its conversion claim against Rocky River "rests on the fact that the bales of crushed aluminum cans were taken off the truck and never returned to their rightful owner." (Doc. 87 at 2412). Rocky River argues that it is entitled to immunity on All American's conversion claim under Ohio's Political Subdivision Tort Liability Act. Ohio Rev. Code 2744.01, et seq. For the following reasons, the Court agrees that the city is entitled to immunity.

The parties agree that Rocky River is a political subdivision that is generally immune from liability for claims resulting from the performance of governmental functions, including the provision of police services. All American, however, argues that the exception to immunity set forth in Ohio Rev. Code § 2744.02(B)(4) applies in this case. That section states:

> Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the *negligence* of their employees and that occurs within or on the grounds of, *and is due to physical defects* within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.

Ohio Rev. Code § 2744.02(B)(4) (emphasis added). The exception in § 2744.02(B)(4) applies only to negligence actions, not intentional torts. *R. K. v. Little Miami Golf Ctr.*, 1 N.E.3d 833, 844 (1st Dist. 2013) ("The physical-defect exception in R.C. 2744.02(B)(4) does not apply to intentional torts.") Conversion is an intentional tort, so this exception is inapplicable. *See Estate of Barney v. Manning*, 2011 WL 346293, at * 3 (8th Dist. Feb. 3, 2011) ("Conversion is an intentional tort."). In addition, All American has not provided any evidence that the conversion

was "due to physical defects within or on the grounds of" the city's service garage. Because All American has not shown that any of the exceptions in Ohio Rev. Code § 2744.02(B) applies, the Court need not address whether immunity can be reinstated under the defenses available in § 2744.03.

For these reasons, the City of Rocky River is entitled to summary judgment on All American's conversion claim.

**CONCLUSION**

For the foregoing reasons, Defendants Monte Hamaoui and the City of Rocky River's Motion for Summary Judgment (Doc. 69), Defendant Ohio State Highway Patrol Trooper James Baker's Motion for Summary Judgment (Doc. 71), and Defendant Monte Hamoui and the City of Rocky River's Motion to Strike Affidavit of Joseph Wilkes (Doc. 91) are GRANTED.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/8/16